# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JONATHAN TYRONE HOUGH, | ) | |
| | ) | |
| | ) | |
| Plaintiff, pro se, | ) | |
| v. | ) | |
| | ) | |
| J.L. MOZINGO, in his individual | ) | |
| capacity and official capacity as an | ) | 1:04CV609 |
| agent of North Carolina; MURIEL K. | ) | |
| OFFERMAN, Secretary of Revenue, | ) | |
| State of North Carolina, in her | ) | |
| individual capacity and official | ) | |
| capacity; and the STATE OF | ) | |
| NORTH CAROLINA, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION AND ORDER OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on Defendants' motion to dismiss (docket nos. 4, 18), and on a motion by Plaintiff to be allowed to conduct discovery before a ruling on summary judgment (docket no. 28).  Since there has been no consent, the court must deal with the motions by way of a recommended disposition.  The parties have responded in opposition to each motion, and the matter is ripe for disposition.  For the reasons discussed herein, it will be recommended that the court grant Defendants' motion to dismiss.

## BACKGROUND

Pro se Plaintiff Jonathan Hough is serving a prison sentence after being

convicted in federal court on drug charges stemming from an arrest for cocaine possession on September 26, 2000, in Greensboro, North Carolina. The State of North Carolina originally filed criminal charges against Plaintiff, but the charges were subsequently dropped. Plaintiff was, however, required to pay a drug tax on the drugs seized from him under North Carolina's Unauthorized Substances Act ("the drug tax"), N.C. GEN. STAT. §§ 105-113.105 et seq. (2000). In this action, Plaintiff has sued to recover the money confiscated by the State of North Carolina in order to satisfy the drug tax.

**FACTS**

In his verified complaint, Plaintiff alleges the following facts, as paraphrased here by the court:

On September 26, 2000, Greensboro Police arrested Plaintiff after finding him in possession of several bags of white powdery and rock-like substances weighing 104.3 grams and which the police suspected was cocaine. Defendants seized $2,592 in cash from Plaintiff's person, and Defendants completed a "Report of Asset and/or Seizure Involving Nontaxpaid (unstamped) Controlled Substances." Defendant Mozingo subsequently weighed the white substance again and erroneously concluded that it weighed 119 grams. Defendants issued a Warrant for Collection of Taxes in the amount of $8,369.67 levied on the drugs seized from Plaintiff. On September 28, 2000, Plaintiff was released from custody on a bail bond.

-2-

On October 9, 2000, Defendants garnished $5,359.17 from a State Employees' Credit Union account in Plaintiff's mother's name to be used as a tax levy assessed on the drugs seized from Plaintiff. On October 12, 2000, Defendants sent a "Notice of Unauthorized Substances Tax Assessment" to Plaintiff for the money seized from Plaintiff's mother's bank account and from his person when he was arrested. The notice was addressed to "Mr. Jonathan Tyrone Hough, 310 Lowdermilk Street, Greensboro, NC 27401." The notice stated that a tax assessment on the seized drugs was proposed pursuant to N.C. GEN. STAT. § 105-113.111 and further warned that Plaintiff had thirty days to submit a written request for a hearing on the assessment or the assessment would become final and conclusive without further notice. Finally, the notice stated that if Plaintiff failed to respond immediately to the proposed assessment, by remitting the full amount shown due or by posting a bond, collection would proceed regardless of whether Plaintiff requested a hearing. Plaintiff alleges that he did not receive the notice at his residence or otherwise.

In July 2001, the State of North Carolina dismissed the drug charges against Plaintiff. A federal grand jury subsequently indicted Plaintiff, and on September 25, 2001, Plaintiff was convicted in this court for the drug charges stemming from the drugs seized from him on September 26, 2000. On July 30, 2002, Plaintiff filed a Motion for Return of Property in Guilford County Superior Court, requesting that the

money that had been confiscated be returned to him.[1]  The state court subsequently

denied Plaintiff's Motion for Return of Seized Property.

On June 29, 2004, Plaintiff filed an action in this court, in which he alleges

several constitutional claims against Defendants through a section 1983 action as

well as a state law negligence claim.  In his first claim, Plaintiff alleges a violation of

his Fifth Amendment due process rights in that Defendants failed to provide him with

written notice before depriving him of $7,951.17 (by seizing $2,592 from his person

in September 2000 and by garnishing $5,359.17 from a bank account in his mother's

name in October 2000) for a proposed tax levy.  In his second claim, Plaintiff alleges

a violation of his criminal procedural guarantees under the Sixth Amendment

pursuant to this circuit's court of appeals opinion in *Lynn v. West*, 134 F.3d 582 (4th

Cir. 1998), which held that a previous version of the North Carolina drug tax was a

criminal penalty that could not be enforced absent the constitutional safeguards that

attach to criminal proceedings.  Plaintiff states that he seeks injunctive relief on his

first two claims in that he requests that this court enter an order enjoining

Defendants to return to Plaintiff $7,951.17, plus interest.  In his third claim, Plaintiff

alleges a violation of his Fifth Amendment due process rights based on Defendants'

erroneous calculation of the tax assessment and increasing the weight of the drugs

---

[1]  Plaintiff's complaint erroneously states that the motion for return of property
was filed in September 2002.  The motion was filed on July 30, 2002, and Plaintiff
correctly states as much in one of his briefs.  *See* Pl.'s Reply to Defs.' Response to Pl.'s
Br. Opp. Mot. Dism. or Summ. J., p. 1.

to justify collecting all money seized from Plaintiff for the tax. In support of this claim, Plaintiff alleges that the Greensboro Police Department initially correctly found that the drugs weighed 104.3 grams, but that Defendants subsequently erroneously increased the weight to 119 grams and then used that amount to assess the drug tax against Plaintiff. As to this claim, Plaintiff seeks $700–the amount he was allegedly overcharged based on Defendants' error in weighing the drugs–plus tax. In his fourth claim, Plaintiff alleges a state law claim for negligence based on his allegations that Defendants acted negligently in seizing $7,951.17 and assessing a tax levy against Plaintiff when, among other things, Defendants failed to serve notice of the intent to forfeit money that did not belong to Plaintiff for a tax assessment. Finally, Plaintiff states that he also seeks declaratory relief as to all of his federal constitutional claims, plus punitive damages, costs, and attorneys fees.

Defendants have filed a motion to dismiss pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure. Defendants contend, among other things, that the Tax Injunction Act bars the court from exercising subject matter jurisdiction over Plaintiff's claims.[2] For the reasons stated herein, the court agrees. Defendants' motion to dismiss should therefore be granted.

## DISCUSSION

A party may challenge a federal court's jurisdiction over the subject matter of

---

[2] Defendants also contend that Plaintiff's claims are barred by the statute of limitations applicable to each claim and that Plaintiff's claims are barred by Eleventh Amendment immunity and qualified immunity.

a controversy where there is a question as to whether the complaint factually alleges "a non-frivolous claim arising under federal law" over which the court has jurisdiction to evaluate the merits. *Baker v. Carr*, 369 U.S. 186, 199-200 (1962); *see also* FED. R. CIV. P. 12(b)(1). Upon a challenge to subject matter jurisdiction, the plaintiff bears the burden of persuasion. All parties, however, may submit evidence outside the pleadings to substantiate their positions with regard to jurisdiction. *See Williams v. United States*, 50 F.3d 299, 304 (4th Cir. 1995). After considering the evidence, the court must grant the motion to dismiss if it determines that the relevant jurisdictional facts are undisputed and that the moving party's challenge is valid as a matter law. *Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).

The Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, provides: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." *See Collins Holding Corp. v. Jasper County, S.C.*, 123 F.3d 797, 799 n.2 (4th Cir. 1997). The TIA, thus, prohibits district courts from exercising jurisdiction over an action if (1) the action is to "enjoin, suspend or restrain the assessment, levy or collection" of a state tax, (2) the tax is a "tax under State law," and (3) the state provides a "plain, speedy and efficient remedy" in its own courts. *Lynn*, 134 F.3d at 594. Here, Plaintiff seeks to enjoin a tax that has been assessed against him under North Carolina's drug tax statute. *See* N.C. GEN. STAT. §§ 105-113.105 through 105-113.113. The drug tax imposes an excise tax on "dealers," who are defined as persons who illegally possess a sufficient quantity of certain "unauthorized

substances." N.C. GEN. STAT. § 105-113.106. The "unauthorized substances" subject to the drug tax include "controlled substances" as that term is defined in the "North Carolina Controlled Substances Act," N.C. GEN. STAT. § 90-86 et seq., as well as illicit mixed beverages, illicit spiritous liquor, and mash. N.C. GEN. STAT. § 105-113.106. Under the drug tax statute, dealers are required to report to the North Carolina Department of Revenue the taxes owed for possession of these unauthorized substances. N.C. GEN. STAT. § 105-113.108. Dealers are required to pay the tax within 48 hours of acquiring actual or constructive possession of the unauthorized substances if the substances do not have a stamp indicating that a tax has already been paid. N.C. GEN. STAT. § 105-113.109. The Department of Revenue is then required to issue stamps to affix to the unauthorized substances to indicate that the tax has been paid. N.C. GEN. STAT. § 105-113.108. Once the tax has been paid, and the stamp has been affixed to the unauthorized substance, no additional tax is due even though the substance may be handled by subsequent dealers. N.C. GEN. STAT. § 105-113.109. If a dealer fails to pay the drug tax he is subject to an assessment for failing to pay the tax, plus applicable penalties and interest. N.C. GEN. STAT. § 105-113.111. Since drug dealers are not likely to follow the self-reporting requirements of the drug tax, the drug tax provides another way for the Department of Revenue to collect the taxes: If local and state law enforcement agencies seize a certain amount of an unauthorized substance without a tax stamp affixed to it, or arrest an individual possessing a certain amount of an

-7-

unauthorized substance without a tax stamp affixed to it, the agencies are required to report it to the Department of Revenue within 48 hours of the seizure or arrest.

The initial question for the court is whether the North Carolina drug tax is so punitive in nature that it is in reality a criminal punishment rather than a "tax" within the meaning of the TIA. The Supreme Court has stated that in determining whether a tax is so punitive in nature that it must be characterized as criminal punishment rather than as a tax, a court must first ascertain whether the legislature meant the statute to establish civil proceedings. *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, the court must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the state's intention to deem it civil. To determine whether a civil penalty is so punitive that it should be characterized as criminal punishment, a court must consider the seven "useful guideposts" listed by the Supreme Court in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963), and reaffirmed in *Hudson v. United States*, 522 U.S. 93 (1997). These factors include: (1) whether the sanction involves an affirmative disability or restraint; (2) whether the sanction has historically been regarded as a punishment; (3) whether the sanction comes into play only upon a finding of scienter; (4) whether the sanction promotes the traditional aims of punishment such as retribution and deterrence; (5) whether the behavior which is sanctioned is already a crime; (6) whether the

-8-

sanction serves an alternative purpose; and (7) whether the sanction appears excessive in relation to the alternative purpose. *See id.* at 99-100. The court must consider these factors "in relation to the statute on its face" and only "the clearest proof" will transform what the legislature has designated a civil remedy into a criminal punishment. *Id.* at 100.

The Supreme Court specifically addressed whether another state's drug tax constituted a criminal penalty in *Department of Revenue of Montana v. Kurth Ranch*, 511 U.S. 767 (1994), and that case also informs this court's inquiry. In *Kurth Ranch*, the defendants were convicted and sentenced after pleading guilty to drug charges. Later, the State of Montana sought to impose a drug tax on the defendants based on the same criminal conduct under the Montana Dangerous Drug Tax Act. After applying a "*Kennedy*-like" test, the Court in *Kurth Ranch* held that Montana's drug tax was "the functional equivalent of a successive criminal prosecution," 511 U.S. at 784, and the Double Jeopardy Clause of the Fifth Amendment therefore precluded the imposition of the tax penalty after the underlying drug prosecutions were over.[3] *See Hudson*, 522 U.S. at 102 n.6 (discussing *Kurth Ranch*). The *Kurth Ranch* Court noted that, although the Montana Dangerous Drug Tax Act had been labeled by the

_____

[3] The Double Jeopardy Clause is not at issue here because it does not bar successive prosecutions by different sovereigns. Here, only the United States prosecuted Plaintiff for cocaine possession, so the Double Jeopardy Clause does not bar North Carolina's enforcement of the drug tax even if it is a criminal penalty. Because the United States brought the prior criminal prosecution, North Carolina remained free to impose its own criminal sanctions.

-9-

Montana legislature as a "tax" rather than as a criminal penalty, the drug tax was in fact a criminal penalty. *Id.* at 784. The Court observed that the drug tax had "unusual" features which rendered it a second punishment for double jeopardy purposes. For instance, the Court noted the high tax rate and deterrent purpose of the tax, observing that a "significant part of the assessment was more than eight times the drug's market value–a remarkably high tax" and furthermore "[t]hat the Montana Legislature intended the tax to deter people from possessing marijuana is beyond question." *Id.* at 780. The Court stated that these two factors "lend support to the characterization of the drug tax as punishment," although "these features, in and of themselves, do not necessarily render the tax punitive." *Id.* at 781. The Court observed that the drug tax also had "[o]ther unusual features, however, [which] set the Montana statute apart from most taxes." *Id.* The Court noted, for instance, that the Montana drug tax was "conditioned on the commission of a crime," which was "significant of penal and prohibitory intent rather than the gathering of revenue." *Id.* The Court noted that it had previously "relied on the absence of such a condition to support its conclusion that a particular federal tax was a civil, rather than a criminal, sanction."[4] *Id.* at 781 & n.20. The Court stated, "In this case, the tax

_____

[4] The Court was referring to its decision in *United States v. Sanchez*, 340 U.S. 42 (1950), in which the Court examined a federal marijuana tax that taxed the transfer of marijuana to a person who had not paid a special tax and registered. Under the statute, the transferor's liability arose when the transferee failed to pay the tax. The Court had stated in *Sanchez* that "[s]ince his tax liability does not in effect rest on criminal conduct, the tax can be properly called a civil rather than a criminal sanction." 340 U.S. at 45.

assessment not only hinges on the commission of a crime, it also is exacted only after the taxpayer has been arrested for the precise conduct that gives rise to the tax obligation in the first place" and "[p]ersons who have been arrested for possessing marijuana constitute the entire class of taxpayers subject to the Montana tax." *Id.* at 781. The Court further observed that "[a]lthough [the Montana drug tax] purports to be a species of property tax–that is, a 'tax on the possession and storage of dangerous drugs,' . . . it is levied on goods that the taxpayer neither owns nor possesses when the tax is imposed. Indeed, the State presumably destroyed the contraband goods in this case before the tax on them was assessed." *Id.* at 783. The Court observed that "[a] tax on 'possession' of goods that no longer exist and that the taxpayer never lawfully possessed has an unmistakable punitive character." *Id.* "Taken as a whole," the Court concluded, "this drug tax is a concoction of anomalies, too far removed in crucial respects from a standard tax assessment to escape characterization as punishment . . . ." *Id.*

This circuit's court of appeals has not yet determined whether North Carolina's drug tax, as it was written when it was assessed against Plaintiff in 2000, is a "tax" under state law within the meaning of the TIA, or whether in reality it is a "criminal penalty." The court of appeals has addressed, however, whether a previous version of the drug tax was a tax within the meaning of the TIA in *Lynn v. West*, and a discussion of *Lynn* is appropriate here. 134 F.3d 582. In *Lynn*, the State of North Carolina assessed a $390,000 tax liability against a dealer under North Carolina's

-11-

drug tax as it existed in 1993.  *Id.* at 583. The dealer and some of his relatives filed

a lawsuit against the state and two of its tax officials in this court challenging the

constitutionality of the tax and alleging civil rights violations under 42 U.S.C. § 1983.

The court found, among other things, that it was barred from exercising jurisdiction

over the plaintiffs' claims for declaratory and injunctive relief because the North

Carolina drug tax was a "tax" under state law within the meaning of the TIA.  *Id.* at

584.  On appeal, the court of appeals held that North Carolina's drug tax was in

reality a criminal penalty–thus, federal court jurisdiction was not barred by the TIA.

The court observed that the North Carolina drug tax had the same unusual features

that had led the Supreme Court in *Kurth Ranch* to conclude that the Montana drug

tax was a criminal penalty.  First, the *Lynn* court noted that, like the Montana drug

tax, the North Carolina drug tax imposed a high rate of taxation and, thus, was

primarily created with the purpose of deterrence.  The *Lynn* court observed that

application of the drug tax plus penalties had yielded a tax liability of sixteen times

the market value of the drugs seized, which was "an even higher penalty than the

tax in *Kurth Ranch.*"   According to the *Lynn* court, "this shows that, like in *Kurth*

*Ranch*, the tax rate has no rational relationship to the market value of the drugs. In

addition, the extremely high tax is 'beyond question' intended 'to deter people from

possessing [illegal drugs].'"  *Id.* at 589-90 (citations omitted).  The *Lynn* court also

found that, like the Montana drug tax, the North Carolina drug tax was conditioned

on the commission of a crime in that the "[t]he Drug Tax is imposed on 'dealers,' i.e.,

-12-

persons who possess sufficient quantities of a 'controlled substance' as that term is defined in the criminal code of North Carolina," *id.* at 590, and is therefore "based on a criminal act," *id.* at 591. Finally, the court observed that the North Carolina drug tax "has the fourth feature present in *Kurth Ranch*: the tax has no relationship to lawful possession. . . . In this case, as with the Montana tax, the taxpayer [] had no property right in the drugs, which had been confiscated by the time the Department of Revenue made its assessment." *Id.* at 591. The *Lynn* court concluded:

> The *Kurth Ranch* Court did not indicate that the features it cited were meant to be exclusive. However, the Drug Tax contains no features that allow us to distinguish *Kurth Ranch*. The rate of taxation is even steeper than the tax in *Kurth Ranch*. Unlike the application of a normal income tax on illegal activity, the Drug Tax is enforced only against criminals. And unlike the marijuana tax upheld in *Sanchez*, the Drug Tax does not contemplate lawful dealings in the product that is the subject of the tax. The Drug Tax singles out a class of persons who have engaged in criminal activity and subjects the class to a rate of taxation far beyond that faced by any legitimate taxpayer. . . . Accordingly, we hold that the Drug Tax is a criminal penalty.

*Id.* at 592. Thus, the *Lynn* court determined that North Carolina's drug tax was really a criminal penalty, which could not be enforced without the constitutional safeguards that accompany criminal proceedings. The drug tax was, therefore, not a "tax" within the meaning of the TIA, and the TIA did not bar federal court jurisdiction over the plaintiffs' challenge to the North Carolina drug tax.

Amendments to the North Carolina Drug Tax

The North Carolina drug tax has been amended several times since the 1993 version at issue in *Lynn*. Indeed, the North Carolina legislature amended the drug

-13-

tax specifically to remove the features that had resulted in its categorization as a criminal penalty in *Lynn*. For instance, as part of the amendments made in 1998, the legislature stated:

> Whereas, the intent of the General Assembly in enacting this tax continues to be to raise revenue through a civil tax on this highly profitable activity . . . [and] not to create a criminal penalty . . . Whereas, upon . . . challenge in the federal courts, the controlled substance tax was found in 1998 to be a criminal penalty . . . Whereas, it is, therefore, the intent of the North Carolina General Assembly to modify the tax in accordance with [*Lynn*], so that the tax may continue to be assessed in a manner consistent with the law as interpreted [in *Lynn*].

*See Nivens v. Gilchrist*, 319 F.3d 151, 156 (4th Cir. 2003). Since these amendments, the court of appeals has not definitively addressed whether the drug tax is still a criminal penalty or whether it is now a "tax" under state law within the meaning of the TIA. As Defendants point out, however, in *Nivens v. Gilchrist*, the court of appeals discussed the effect of the amendments. 319 F.3d 151. In *Nivens*, the plaintiffs brought an action in the Western District of North Carolina to enjoin the pending state criminal drug prosecutions against them, arguing that their payment of the North Carolina drug tax was a criminal penalty; thus, any criminal punishment imposed in their pending criminal trial would violate the Double Jeopardy Clause of the Fifth Amendment. The district court abstained from exercising jurisdiction based on *Younger v. Harris*, 401 U.S. 37 (1971). On appeal, the plaintiffs contended that the district court should not have abstained under *Younger* because it "plainly

-14-

appear[ed]" that the courts of North Carolina would "not afford" them "adequate protection." *Nivens*, 319 F.3d at 155 (quoting *Younger*, 401 U.S. at 44). The plaintiffs conceded that they had pretrial avenues in which they could raise their double jeopardy claims in state court, but they argued that, notwithstanding the *Lynn* decision, the North Carolina Supreme Court had already decided that North Carolina's pre-1995 amendment drug tax was not a criminal penalty.[5] *See State v. Ballenger*, 123 N.C. App. 179, 472 S.E.2d 572 (1996). Thus, the plaintiffs argued that any contrary argument in a North Carolina state court would be futile. The *Nivens* court disagreed, stating that "because neither the Fourth Circuit nor the North Carolina Supreme Court has ever analyzed the post-amendments drug tax under which Appellants were assessed their taxes to determine if it is a criminal punishment, Appellants cannot demonstrate that the North Carolina courts will plainly not afford them adequate protection." *Nivens*, 319 F.3d at 155. The court then discussed the amendments to the drug tax:

> In 1995, 1997, and again in 1998, before North Carolina assessed the drug tax on Appellants, the General Assembly of North Carolina, partially in response to the Supreme Court's decision in *Kurth Ranch* and our decision in *Lynn*, dramatically altered its drug tax. For example, in 1995, the General Assembly (1) made the drug tax payable upon receipt of drugs rather than upon a criminal violation; (2) lowered the tax on various drugs; (3) repealed the section that made the violation of the drug tax a Class I felony; and (4) lowered the interest

---

[5] Indeed, even after *Lynn*, the North Carolina courts have continued to hold that, at least with respect to the pre-1995 amendments, the drug tax is not a criminal penalty. *See State v. Adams*, 132 N.C. App. 819, 513 S.E.2d 588 (1999) (refusing to follow *Lynn*).

and penalty applicable when a dealer fails to pay the tax within 45 days of receiving the drugs from 100% to 50%. *See* N.C. GEN. STAT. §§ 105-113.106, -113.107, -113.110, 113.110(A) (1994), amended by An Act to Revise the Controlled Substance Excise Tax, Ch. 340, H.B. No. 123 (1995). In 1997, the General Assembly included previously unaccounted for substances, such as mash and other illicit beverages. *See* N.C. GEN. STAT. §§ 105-113.106, - 113.107 (1996), amended by An Act to Levy an Excise Tax on Illicit Spirituous Liquor, an Excise Tax on Mash, and an Excise Tax on Illicit Mixed Beverages, N.C. Sess. Laws 1997-292 (1997). In 1998, the General Assembly (1) lowered the rate at which it taxed cocaine from $200 per gram to $50 per gram; (2) lowered the rate at which it taxed drugs based on dosage units from $400 per 10 dosage units to $200 per 10 dosage units; and (3) completely abolished the special penalty and interest section and replaced it with the general interest and penalty provisions applicable to all taxes paid in North Carolina, effectively reducing the penalty for late payment from 50% to 10-40%. *See* N.C. STAT. §§ 105-113.107, -113.110A (1997), amended by An Act to Amend the Excise Tax on Controlled Substances, N.C. Sess. Laws 1998-218 (1998).

*Id.* at 156-57. The *Nivens* court concluded that "[b]ased on the wide-ranging amendments to the drug tax and the fact that Appellants make no claim that the amendments were insubstantial, we decline to hold that North Carolina's post-amendments drug tax is sufficiently similar to the pre 1995 amendment drug tax such that we should treat them the same." *Id.* at 157. *See also Vick v. Williams*, 233 F.3d 213, 218 (4th Cir. 2000) (in a habeas proceeding under the AEDPA amendments, stating that "the North Carolina Drug Tax at issue in this case is itself materially distinguishable from the Montana Drug Tax at issue in *Kurth Ranch* on the basis of statutory language").

Here, under *Hudson* and *Kurth Ranch*, this court finds that, in its current form, the North Carolina drug tax is a "tax" under state law within the meaning of the TIA

and not a criminal penalty. First, in enacting the post-1995 amendments, the North Carolina legislature specifically intended for the tax to be imposed as a civil penalty. Because the Act purports to be civil on its face, a presumption arises that the statute is civil in nature. Petitioners can overcome this presumption only "by the clearest proof that the statutory scheme is so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100. Here, application of the seven *Kennedy* factors does not meet the "clearest proof" standard under *Hudson* to transform the North Carolina drug tax into a criminal penalty. First, the taxes imposed do not constitute an "affirmative disability or restraint," as that term is ordinarily understood. *Hudson*, 522 U.S. at 104. The imposition of taxes is "certainly nothing approaching the 'infamous punishment' of imprisonment." *Id.* (quoting *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)). Second, taxes have not historically been viewed as punishment. *See Kurth Ranch*, 511 U.S. at 779-80 ("Whereas fines, penalties, and forfeitures are readily characterized as sanctions, taxes are typically different because they are usually motivated by revenue-raising, rather than punitive, purposes."). Third, the statute at issue here does not contain a scienter requirement–it imposes strict liability upon the possession of certain unauthorized substances. Furthermore, the statute allows individuals to possess certain drugs illegally without incurring tax liability or penalties, provided either the individual's activities involve less than the amount of drugs specified in the drug tax statute or the individual timely pays the mandated tax. *See*

-17-

N.C. GEN. STAT. § 105-113.108.  Fourth, the North Carolina courts have acknowledged that the tax does serve a deterrent purpose.  *See Ballenger*, 123 N.C. App. at 184, 472 S.E.2d at 575.  The Supreme Court has recognized, however, that a monetary sanction may deter others without being criminal in nature.  *See Hudson*, 522 U.S. at 105 ("[T]he mere presence of this purpose is insufficient to render a sanction criminal.").  Fifth, possession of the unauthorized substances that are subject to the tax is a crime and the tax is triggered by the act of possessing the requisite amount of these substances.  The penalty, however, is for failure to pay the tax only and does not relate to the illegal act of possessing the substances.  In any event, the fact that the conduct for which the taxes are imposed may also be criminal "is insufficient to render" the drug tax criminally punitive.  *See Hudson*, 522 U.S. at 105.  Sixth, the North Carolina legislature has clearly stated that it had an alternative purpose in enacting the drug tax–to raise revenue through a civil tax on a highly profitable activity.  Finally, and perhaps most significantly, under the seventh *Kennedy* factor–whether the sanction appears excessive in relation to the alternative purpose–the drug tax and the corresponding penalties are now dramatically lower than they were under the version that was at issue in *Lynn*.  For instance, through several amendments, the legislature has lowered the tax on various drugs as well as the interest and penalties.  In 1998, the legislature (1) lowered the rate at which it taxed cocaine from $200 per gram to $50 per gram; (2) lowered the rate at which it taxed drugs based on dosage units from $400 per 10 dosage units to $200 per 10

-18-

dosage units; and (3) completely abolished the special penalty and interest section and replaced it with the general interest and penalty provisions applicable to all taxes paid in North Carolina, effectively reducing the penalty for late payment from 50% to 10-40%. Here, Plaintiff was taxed $50 per gram for possessing 119 grams of cocaine, for a total of $5,950. He was further assessed a 40% penalty for each gram, equaling $20 per gram and totaling $2,380 for all 119 grams seized. Finally, he was assessed with $113.71 in interest. The court has no information before it regarding the market value of the cocaine that was seized from Plaintiff in this case. Nevertheless, the court is satisfied that the total taxes and penalties imposed here were not "remarkably high" as in *Kurth Ranch*, where the total assessed taxes and penalties were eight times the market value, or *Lynn*, where the total assessed taxes and penalties were sixteen times the market value. For instance, the court in *Lynn* found that the market value for a kilogram of cocaine was $25,000. One of the plaintiffs had been assessed a $194,000 tax for his possession of 970 grams of cocaine at a rate of about $200,000 per kilogram, plus another $194,000 in penalties, plus $1,125.20 in interest, for a total drug tax liability of $389,125.20, which the *Lynn* court noted was sixteen times the market value. Both the tax and penalties under the current version of the drug tax are dramatically lower that those imposed under *Lynn*. Under the post-amendment drug tax at issue here, the same 970 grams of cocaine that was taxed in *Lynn* would only be assessed approximately $67,900 ($50 per gram plus a 40% penalty, totaling $70 per gram), which would be

-19-

approximately one-sixth of the assessed amount in *Lynn*.  *See Nivens*, 319 F.3d at

158 n.11.  Even assuming that under the post-amendment drug tax the market value

for cocaine has not gone up since *Lynn*, it appears that the amount of tax and

penalties assessed for each gram of cocaine ($70) is still less than three times the

market value ($25), which is dramatically lower than the rate in both *Kurth Ranch*

and *Lynn*.  Thus, the court finds that the current North Carolina drug tax does not

have the same "remarkably high" tax rates as in *Kurth Ranch* and in *Lynn* that

contributed to the courts' conclusions that the taxes in those cases were in reality

criminal penalties.  Thus, the sanction imposed under the drug tax does not appear

excessive in relation to the alternative purpose of raising revenue through the tax.

In sum, all of the above-stated factors considered in their entirety convince the

court that the North Carolina drug tax is not criminal punishment, but rather serves

as a civil penalty and, thus, is a "tax" under state law within the meaning of the TIA.

*Accord Simpson v. Bouker*, 249 F.3d 1204 (10th Cir. 2001) (concluding that the

Kansas drug tax was not a criminal punishment for double jeopardy purposes

because the state legislature intended for the tax to be civil, the tax was not

conditioned on the commission of a crime, and did not apply to all drug possessors);

*Padavich v. Thalacker*, 162 F.3d 521 (8th Cir. 1998) (concluding that the Iowa drug

tax was not a criminal punishment for double jeopardy purposes because the tax

was not conditioned on the commission of a crime, the tax was due and payable

immediately upon possession of drugs and was not based on an arrest, and

information given by a drug dealer could not be used against him in a criminal proceeding); *cf. Dye v. Frank*, 355 F.3d 1102 (7th Cir. 2004) (concluding that the Wisconsin drug tax was a criminal penalty for double jeopardy purposes because it imposed a high tax rate, was based on the commission of a crime, and was applied only after the drugs were presumably confiscated and destroyed). In sum, the North Carolina drug tax in its current form is a "tax" under state law within the meaning of the TIA and here Plaintiff is seeking to have this court "enjoin, suspend, or restrain" the levy or collection of this state tax.[6]

The court must next determine whether the third element necessary to bar jurisdiction under the TIA is present–that is, whether state law provides a plain, speedy, and efficient remedy for tax assessments under North Carolina's drug tax. As this circuit's court of appeals has explained:

> "On its face, the 'plain, speedy and efficient remedy' exception appears to require a state-court remedy that meets certain minimal procedural criteria." The essential question is whether the state remedy "provides the taxpayer with a 'full hearing and judicial determination' at which she may raise any and all constitutional objections to the tax." Stated differently, the taxpayer is entitled to a meaningful opportunity to assert federal constitutional challenges to the tax in state court. Thus, a real or perceived defect in the substantive remedy afforded a taxpayer under state law does not clothe the district court with jurisdiction to hear appellants' claims.
>
> In addition to meeting minimal procedural safeguards, the state

---

[6] Plaintiff denies that he is seeking to have this court "enjoin, suspend, or restrain" the levy or collection of a state tax. As set out in Plaintiff's prayer for relief, however, he seeks as a remedy "injunctive relief enjoining" the return of "$7,951.17 with interest."

remedy must be certain–state remedies that are merely speculative will not divest the federal courts of jurisdiction to entertain a state taxpayer's claim.  However, the "certainty" that is required is procedural in nature; the Tax Injunction Act does not guarantee that the substantive relief sought by the taxpayer be certain or even likely.  In examining whether state law provides a full opportunity for the presentation of federal challenges, courts must "be faithful to the congressional intent 'to limit drastically' federal-court interference with state tax systems, [and] construe narrowly the 'plain, speedy and efficient' exception to the Tax Injunction Act."

*Folio v. City of Clarksburg, W. Va.*, 134 F.3d 1211, 1214-15 (4th Cir. 1998) (citations omitted).

Here, North Carolina law provides a plain, speedy, and efficient remedy for Plaintiff's challenges to the money confiscated from him to pay the drug tax.  Under the applicable North Carolina statutes, Plaintiff could have requested an administrative hearing at which he could have introduced evidence and arguments in support of any contention that the assessment was somehow improper.  Plaintiff did not, however, request a hearing, and, thus, the uncontested assessment became final.  If Plaintiff had requested a hearing, and had the assessment been affirmed at the hearing, Plaintiff could have appealed to the Tax Review Board, an independent administrative body, for review of the hearing decision.  *See* N.C. GEN. STAT. § 105-241.2.  If the Tax Review Board were to affirm the hearing decision, Plaintiff could have appealed the Board's decision in the state court system upon payment of the tax or upon the posting of a bond in the full amount of the outstanding tax debt.  *See* N.C. GEN. STAT. § 105-241.3.  Alternatively, Plaintiff could have paid the tax in full

and sued for a refund in the state court system. *See* N.C. GEN. STAT. § 105-241.4 and N.C. GEN. STAT. § 105-267 (2003). The availability of administrative review of a state tax matter and subsequent judicial review in state court constitutes a "plain, speedy, and efficient" remedy within the meaning of 28 U.S.C. § 1341. Thus, North Carolina's statutory tax hearing and refund procedures afford taxpayers in Plaintiff's position a "plain, speedy, and efficient remedy." The fact that Plaintiff did not take advantage of any of these remedies–and even though it may be too late for him to do so now–does not mean that a "plain, speedy and efficient" remedy was unavailable in the state court.

Plaintiff alleges, however, that he did not timely request a hearing because he did not receive proper notice of the proposed assessment against him. For instance, Plaintiff alleges that the Notice of Unauthorized Substances Tax Assessment was mailed to his home address on October 12, 2000, only after the State of North Carolina had already confiscated his money, and he further alleges that he never received the notice. The North Carolina statute regarding notice of a proposed assessment, N.C. GEN. STAT. § 105-241.1(b), provides in part: "The Secretary shall deliver the notice of a proposed assessment to a taxpayer either in person or by United States mail sent to the taxpayer's last known address." The statute further provides that "[a] notice mailed to a taxpayer is presumed to have been received by the taxpayer unless the taxpayer makes an affidavit to the contrary within 90 days after the notice was mailed." Thus, Plaintiff is presumed to have received the notice

-23-

mailed to his address, and he did not submit an affidavit to the contrary within ninety days after the notice was mailed, or otherwise request a timely administrative hearing.  Thus, it appears that he did not comply with the requirements for administrative review under state law, which could be a possible substantive bar to his claims in state court.[7]  Nevertheless, the "plain, speedy, and efficient" state court remedy requirement under the TIA refers to procedural, not substantive, defects. *Folio*, 134 F.3d at 1216 (stating that "the Tax Injunction Act only guards against procedural defects, not substantive defects, and it does not allow appellants to invoke the jurisdiction of the federal courts merely because state precedent is unfriendly")  (citation omitted).  In sum, because each of the three elements under the TIA necessary to prohibit federal district court jurisdiction over an action is

---

[7]  Defendants deny that the notice of the proposed assessment was sent to Plaintiff on October 12.  Defendants contend that on September 26, 2000, when Plaintiff was in custody, Defendant Mozingo hand-delivered to Plaintiff the notice of the proposed assessment, which warned Plaintiff of the thirty days in which to request a hearing.  Defendants argue further that the document that was mailed to Plaintiff on October 12 was most likely the Final Notice of Tax Assessment, which is sent out once a proposed assessment has become final and can no longer be contested administratively.  *See* N.C. GEN. STAT. § 105-241.1(d1).  Even if Plaintiff's allegations are true–that is, even if Plaintiff was not hand-delivered the notice of proposed assessment on September 26, 2000, and even if it was not mailed to his address until October 2000 after the State of North Carolina had already confiscated his property–according to Plaintiff's own allegations, the notice that was mailed to his address provided that he could request a hearing within thirty days.  As the court has already concluded, Plaintiff is presumed to have received this mailed notice, and he neither submitted an affidavit to the contrary within ninety days after the notice was mailed, nor otherwise requested a timely administrative hearing.   If Plaintiff had timely requested an administrative hearing upon receiving the notice, he could have raised his due process argument at the hearing. The point here is that the state administrative procedures provided Plaintiff with an opportunity for a full hearing and judicial determination at which he could have raised any constitutional objections to the tax.

present, Plaintiff has failed to show that the subject matter jurisdiction necessary to entertain this action has been conferred on the court, and the court should therefore grant Defendants' motion to dismiss.[8]

## CONCLUSION

For all these reasons, **IT IS RECOMMENDED** that the court **GRANT** Defendants' motion to dismiss.  Furthermore, since the court has not converted the motion into one for summary judgment, Plaintiff's motion to conduct further discovery under Rule 56(f) is not applicable and is **DENIED**.

_____
WALLACE W. DIXON
United States Magistrate Judge

Durham, NC

April 29, 2005

_____

[8]  On its face, the TIA bars suits in federal court for injunctive relief in state tax cases.  Although not obvious from the face of the statute, the Act also bars suits for declaratory relief in state tax cases, *see California v. Grace Brethren Church*, 457 U.S. 393, 408 (1982), as well as suits for a refund of state taxes that have already been paid. *See Home Builders Ass'n of Miss. v. City of Madison, Miss.*, 143 F.3d 1006, 1010 n.6 (5th Cir. 1998).  Finally, to the extent that Plaintiff seeks damages through section 1983 principles of comity would prohibit this court from exercising jurisdiction.  *See Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 110 (1981); *Lawyer v. Hilton Head Pub. Serv. Dist. No. 1*, 220 F.3d 298, 306 (4th Cir. 2000) ("[W]e hold that, to the extent the appellants request injunctive relief or a refund of state taxes, the district court cannot exercise jurisdiction over those actions under the Tax Injunction Act. In addition, principles of comity preclude the district court from exercising jurisdiction over the appellants' claims for damages under § 1983 . . . .").